**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Dec 02 2014, 9:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CRAIG W. GRAHAM**
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) | |
| | ) | |
| K.P., Minor Child, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| K.P., Father, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 10A01-1402-JT-73 |
| | ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

---

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel F. Donahue, Senior Judge
Cause No. 10C04-1307-JT-16

---

**December 2, 2014**

**BROWN, Judge**

Ke.P. ("Father") appeals the involuntary termination of his parental rights to his child K.P. ("Child"). Father raises one issue which we revise and restate as whether the evidence was sufficient to support the termination of his parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

Father is the biological father of Child, born April 26, 2010. When Child was born she tested positive for benzodiazepines and was later removed from the care of Father and M.P. ("Mother"). The Indiana Department of Child Services ("DCS") alleged that Child was a child in need of services ("CHINS"), and Child was declared a CHINS. Father complied with services, and the court dismissed the wardship on May 17, 2011.

On May 31, 2011, Child's Mother was arrested on a warrant for auto theft and was in the Floyd County Jail. On June 1, 2011, following the May 17, 2011 dismissal of Child's first CHINS case, Father brought Child to Clark Memorial Hospital.[1] At the hospital, Father told hospital staff that Child's Mother had beaten and drugged both Father and Child. After a doctor at the hospital examined Child and discovered no evidence of abuse, a call was placed to law enforcement who arrived at the hospital and noted Father's paranoid and delusional behavior. Father tested positive for THC and PCP.

That same day, DCS removed Child from Father's care on the basis of Father's paranoid and delusional behavior and initial refusal to submit to a drug screen while at the

---

[1] Although Mother's rights were also terminated she is not participating in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Father's appeal of the termination of his parental rights to Child.

hospital. On June 2, 2011, DCS filed a CHINS petition alleging that Father's behavior was erratic, and observed that Father had a previously dismissed CHINS case, as well as a history with Illinois child protective services that resulted in the removal and termination of parental rights for two of Father's three children. On July 21, 2011, the court adjudicated Child a CHINS. At the CHINS hearing, Child's Mother admitted the allegations in the petition, but Father failed to appear, and the court granted a default judgment against him.

On September 14, 2011, the court ordered that Father have supervised visitation with Child, and it also ordered that DCS was not required to make reasonable efforts to reunify Father with Child because of the prior Illinois case and prior CHINS case involving Child. In November 2011, DCS filed a termination petition. On April 4, 2012, Father was arrested on charges of altering a vehicle identification number as a class C felony, and disorderly conduct as a class B misdemeanor. On August 6, 2012, Child's Guardian ad Litem ("GAL") filed a report recommending that services "resume" for the parents. Transcript at 66. After the report was filed, the court dismissed the termination petition and resumed services.

The court entered an amended dispositional decree and an amended order of participation, both signed on September 4, 2012, that required Father, among other things, to obtain and maintain stable and appropriate housing, refrain from criminal behavior, complete drug and alcohol assessments, participate in drug and alcohol classes, complete parenting classes, submit to random drug screens, participate in supervised visitation, and pay weekly child support. On October 4, 2012, Father was arrested on charges of dealing cocaine as a class A felony, possession of cocaine as a class B felony, maintaining a

3

common nuisance as a class D felony, possession of paraphernalia as a class A misdemeanor, and was alleged to be an habitual offender. Following his October 4, 2012 arrest, Father was incarcerated.

On July 10, 2013, DCS filed its petition to terminate Father's parental rights to Child. The court held hearings on the termination petition on November 14 and 22, 2013, and on January 16, 2014. At the November 14, 2013 hearing the court heard testimony from, among others, Dr. David Winsch, a Licensed Clinical Psychologist, and Paul Blanton, Child's GAL.

Dr. Winsch indicated that he had received a referral to see Father in September 2010. Dr. Winsch explained that he conducted testing and assessments on Father. Dr. Winsch testified, on the basis of the testing, that he recommended Father "complete a drug and alcohol education class and submit to all random drug tests for the next year" and that he complete "a domestic violence class, [and] that he complete a parenting class" along with maintaining "consistent and gainful employment . . . ." Id. at 27. Dr. Winsch also expressed his concern that Father's history of arrests made it "difficult for [him] to see how someone who's been arrested as many times as he has been and apparently is at this time too, how he would be capable of providing a stable home for a child." Id. On cross-examination, Dr. Winsch explained that the testing he conducted on Father revealed that Father had a low dependence on both alcohol and drugs, and his mental attitude test scores suggested that he did not suffer from a clinical disorder, but he nevertheless opined that Father likely suffered from "antisocial personality disorder." Id. at 38. Dr. Winsch further testified that Father was "able to describe appropriate parenting attitudes and beliefs," but

4

indicated that Father would not be a good candidate for parenting and counseling classes because the disorder "is largely an untreatable condition." Id. at 38-40. Dr. Winsch testified that an individual with antisocial personality disorder would have difficulty parenting a young child because a parent has to be "available for the child, [and] you can't be repeatedly incarcerated in order to provide for the care of a child." Id. at 43. Dr. Winsch also opined that the lack of empathy, often characteristic of individuals with antisocial personality disorder, would make it difficult for the parent to "put[] [the] child's needs above your own, and mak[e] decisions that are for the best interest of your child." Id.

Blanton, Child's GAL, testified that his recommendation was that "parental rights be terminated" because "the situations that necessitated the original removal of the minor child are most likely to recur." Id. at 69. Blanton further testified that Child "had very significant bonds with her foster parents and the other children who were at the residence," and that Father's "current incarceration makes it impossible for him to parent [Child]." Id. at 70. On cross-examination, Blanton stated that "even after [Father] . . . [was] granted the opportunity to take advantage of services after the original petition had been filed [he] failed to take advantage of those services." Id. at 73. Blanton further testified that Father was "not in full compliance with recommendations or services that were put into place," although Blanton acknowledged that Father was undergoing services on his own initiative before the report recommended that DCS provide services to Father. Id. at 74-75

At the November 22, 2013 hearing, the court heard testimony from Sandra McDonald, who was Child's foster mother; Father; and Susan Stotts, the family case manager ("FCM"). McDonald testified that Child had been living at her home since she

was five days old and that Child left to return to Father's care for five weeks before she was returned to foster care, and that Child had been living with her since June 1, 2011. McDonald acknowledged that Father regularly visited with Child until his incarceration. She described a contact visit that Child had with Father while Father was incarcerated:

> [Child] didn't really remember him, so she did not want to go around and at one point he left the office and came back in and she was sitting on my lap and he picked her up off my lap and she was just screaming, I want my mommy, I want my mommy.

Id. at 84. McDonald indicated that after that visit, there were no more visits with Father. McDonald testified that she was "mom" to Child, and that she was willing to adopt Child if parental rights were terminated. Id.

Father indicated that he had prior felony convictions for burglary including a conviction in 1994 and another in 2003. Father also indicated that since October 4, 2012, he had been residing in the Clark County Jail and was not employed. He testified that his family, which was his "support system" allowed him to support Child while he was in jail, but then indicated that he was not paying child support. Id. at 100. Father indicated that he had custody of Child from March 2011 until June 1, 2011, that he had been in jail for about one third of Child's life, and that he had been arrested for domestic battery against Child's Mother. Father further testified that in the past year, while he was incarcerated, he had visited Child three times but in the past had visited Child "every week." Id. at 103. He acknowledged that he did not complete a court-ordered drug and alcohol assessment, did not complete court-ordered parenting classes, did not remember whether he had submitted to a court-ordered random drug screen, and did not pay court-ordered child support as

6

ordered in the dispositional decree. He testified that he had participated in supervised visitation and that at "this exact moment" he did not have stable and appropriate housing. Id. at 107. He also indicated that at the time of his October 4, 2012 arrest he was residing at the Wayfair Motel.

On cross-examination, Father stated that prior to living at the Wayfair Motel he was living in an apartment in Beech Grove and was working at Beef O'Brady's. He testified that at a visit Child had with her Mother a week after his October 4, 2012 arrest, Child "was asking for her Daddy." Id. at 115. Regarding unpaid child support, Father testified:

> My reason for not paying child support is, I don't know if it is a valid reason but in my way of thinking it was, I felt that I provided the stuff for my daughter. I bought her diapers, I bought all her clothes. And my reason for that was because there were several visits that she appeared that she had on dirty clothes, socks with holes in them stuff like that and I felt like that instead of me giving the Foster parents money I would use the money for what it is actually intended for, for [Child].

Id. at 116. Father stated that he complied with the court's order on substance abuse by attending lectures on "alcohol anonymous, narcotics anonymous" at the Jeff Token Club. Id. at 119. Father further stated that he complied with Dr. Winsch's recommendations because he "attended the classes, uh, took assessments, attended the visitation as he ordered." Id. He indicated that he attended parenting classes on his own initiative at the Clark County Youth Shelter but was unable to complete the classes because of his October 4, 2012 arrest. Father also stated that he had a family member who was willing to be a guardian for Child, and he wanted the court to delay its decision on termination in time for him to file guardianship papers. Father explained that he expected to be released from jail in February or March of 2014.

7

FCM Stotts testified that services had been offered to Father under the order of participation and dispositional decree, and that Father "did not complete parenting classes. He only completed 5 out of the 14 that were offered. I did a drug screen on September 19, 2012. He tested positive for THC, cocaine, opiates, and morphine." Id. at 155. She then stated that Father never provided her with proof of completion of Narcotics Anonymous or Alcoholics Anonymous classes, that "prior to [Father's] arrest he [resided] at the Wayfair Motel," and that after his October 4, 2012 arrest, she was unaware of any services that he may have completed. Id. at 156. She testified that Father visited Child "on a weekly basis," but later stated that Father's attendance at visits was "infrequent . . . ." Id. at 156-157. She stated that the last time Father visited Child was June 6, 2013, and that Child was doing "very well" in her placement and had bonded with her foster family. Id. at 179. She stated that she had not been contacted by any of Father's relatives regarding placement or visitation, that the conditions which led to Child's removal were not likely to be remedied because of Father's "lack of follow through" and incarceration, and that reuniting Child with Father would be a threat to Child's well-being. Id. at 180.

At the start of the January 16, 2014 hearing, the court determined:

it would not at that time [after the November 22, 2013 hearing] terminate the parental rights of [Father] but the Court set forth certain conditions and among those conditions was a requirement that there be an acceptance entrance into drug court, that there be domestic violence classes, that there should be a completion of parenting classes, there should be attempts of regular employment and there should be no further arrests.

Id. at 181-182. DCS stated the parties had been ordered to mediation but "no agreement was able to be made and the mediator did file a report to the Court on January 10th after

8

mediation was unsuccessful" and that DCS was "requesting that the Court find that it is in the best interest of the child to terminate the parent-child relationship . . . ." Id. Father's counsel requested that "the Court refrain from making the decision for sixty days" and that Father "be allowed to testify briefly about his criminal proceeding." Id. at 182-183.

Father's counsel called Father as a witness, and Father stated his belief that he would be released from incarceration on or about April 4, 2014 and would then be willing to engage in domestic violence classes, parenting classes, drug and alcohol classes, and find suitable employment. On cross-examination, he acknowledged that he had not entered into a guilty plea or been sentenced on the drug charges. The court then stated Father received "many opportunities and I don't feel that it would be proper to extend any further, given the charges that he faces in that particular drug court. He's probably going to be in jail for a period of time. So, at this time we'll terminate the relationship." Id. at 185-186.

On March 21, 2014, the court entered its termination order. The court found, in part, that:

> 8.   Father has been incarcerated since October 4, 2012 in the Clark County Jail. Father does not have a date of release from the Clark County Jail and his charges are still pending.
> 9.   Father did not have custody of the Child from May 2010 to March 2011. Father has not had custody of the child since June 2011.
> 10.  Father had a contact visit at the Clark County Jail with the child in April 2012. Contact visits were suspended by the court based on the child's reaction to the contact visit in April 2012.
> 11.  Father failed to complete services provided by DCS.
> 12.  Father failed to complete drug and alcohol classes. Father screened positive for THC and PCP on June 1, 2011 and screened positive for THC, cocaine and opiates included 6 MAM (metabolites of heroin) and Morphine, on September 19, 2012.
> 13.  Father did not complete parenting classes.
> 14.  Father is not employed and has no income.

9

15. Father has not paid child support for the child.

\* \* \* \* \*

27. After removal of Child on June 1, 2011, the Child was never returned to [Father's] care and custody. After formal removal of Child per the Dispositional Decree of September 4, 2012, the Child was never returned to [Father's] care and custody.

\* \* \* \* \*

35. Guardian Ad Litem (GAL), Paul M. Blanton, agrees that it is in the Child's best interest for termination of parental rights and adoption. The GAL's testimony reflected a belief that based on history, neither Mother nor Father would take advantage of services and the reason for removal would reoccur. The child is bonded with and would be emotionally endangered if separated from the foster family.
36. DCS's plan for Child is that [Child] be adopted; this plan is satisfactory for Child's care and treatment.
37. Child has been in the same foster family since approximately June 1, 2011. The Child was previously placed with the same foster family during the previous CHINS removal from May 2010 until March 2011. The child is very bonded with the foster family and they are willing to adopt Child.
38. Adoption would provide permanency for the child in a safe and stable environment.

Appellant's Appendix at 21-23. The court concluded that DCS had "met its burden of proof, proving its petition to terminate . . . Father's parental rights by clear and convincing evidence." Id. at 25.

DISCUSSION

The issue is whether the evidence was sufficient to support the termination of Father's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the

10

evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct. 1197 (2002); see also Bester, 839 N.E.2d at 147; In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (noting that this court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made" (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992))). Thus, if the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

The involuntary termination of parental rights is the most extreme measure that a court can impose and is designated only as a last resort when all other reasonable efforts have failed. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). This policy is in recognition of the Fourteenth Amendment to the United States Constitution which provides parents with the right to establish a home and raise children. Id. However, these protected parental rights are not absolute and must be subordinated to the children's interests to maintain the parent-child relationship. Id.; see also Egly, 592 N.E.2d at 1234 (noting that the "purpose of terminating parental rights is not to punish parents, but to protect the

11

children."). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

 (B) that one (1) of the following is true:

  (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

  (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

  (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

 (C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2).

Father asserts that because of his incarceration "he was unable to participate in services" and that classes and counseling would have helped him to be a better parent. Appellant's Brief at 2. He maintains that prior to his incarceration, he completed some services on his own initiative and attempted to maintain visits with Child while he was incarcerated. Father contends that he "made reasonable efforts to rectify the problems. He believes that the [DCS] failed to show that his behavior will not change." Id.

12

DCS maintains that the court's order terminating Father's rights was supported by clear and convincing evidence. Moreover, DCS asserts that Father "does not specifically challenge any of the court's legal conclusions." Appellee's Brief at 15. DCS further contends that Father also "does not challenge any of the court's findings of facts." Id. at 17. Consequently, DCS posits that Father has waived his sufficiency claims on appeal because he does not specifically contest the court's findings of fact and conclusions of law.

We note that Father does not specifically challenge the trial court's findings or conclusions. To the extent Father argues that the trial court's findings or conclusions are clearly erroneous, Father has waived this issue by failing to make a cogent argument. See In re Involuntary Termination of Parent-Child Relationship of B.R., 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), trans. denied; Ind. Appellate Rule 46(A)(8)(a).

A.    Remedy of Conditions

We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Child outside the home will not be remedied. See Ind. Code § 31-35-2-4(b)(2)(B)(i).

In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re

13

J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. A trial court may also properly consider the services offered to the parent by a local DCS office and the parent's response to those services as evidence of whether conditions will be remedied. See id. at 1252. Finally, we point out that a local DCS office is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability a parent's behavior will not change. See In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Waiver notwithstanding, we note that although Father testified that he attempted to participate in services on his own initiative, the record reveals that Father failed to follow through with the services offered to him during the CHINS case. The court heard testimony from GAL Blanton that "even after [Father] . . . [was] granted the opportunity to take advantage of services after the original petition had been filed [he] failed to take advantage of those services." Transcript at 73. It is established that a "trial court can reasonably consider the services offered . . . and the parent's response to those services," that "the law concerning termination of parental rights does not require" that services be offered "to correct deficiencies in childcare," and that "termination of parental rights may occur . . . as

14

long as the elements of Ind. Code § 31-35-2-4 are proven by clear and convincing evidence." In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

Moreover, Father admitted that he did not comply with the requirements of the dispositional decree, including his failure to complete the drug and alcohol assessment, participate in parenting classes, or pay child support. The record also reveals that Father was arrested twice during Child's CHINS case and was incarcerated on pending charges related to his October 4, 2012 arrest. Father also has a criminal history including convictions for aggravated battery in 1991 and convictions for burglary in 1994 and 2003. Additionally, Father was living in a motel prior to his October 4, 2012 arrest and admitted that he was unable to care for Child due to his incarceration. As noted above, DCS is not required "to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability a parent's behavior will not change." In re Kay L, 867 N.E.2d at 242.

Based upon the record, we conclude that clear and convincing evidence supported the court's determination that there was a reasonable probability that the conditions leading to Child's removal would not be remedied based on Father's lack of adequate housing, criminal history, and failure to participate fully in DCS services during Child's underlying CHINS proceeding.

B.    Best Interests

We next consider Father's assertions that DCS failed to prove termination of his parental rights is in Child's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana

15

Department of Child Services and to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, "[p]ermanency is a central consideration in determining the best interests of a child." In re G.Y., 904 N.E.2d 1257, 1265 (Ind. 2009), reh'g denied. In addition, we have held that the recommendations of a child's case manager and guardian ad litem that parental rights should be terminated support a finding that termination is in the child's best interests. See In re A.B., 887 N.E.2d 158, 170 (Ind. Ct. App. 2008).

Father contends that, notwithstanding Child's need for stability and permanency, "there would have been no prejudice to the child for the [DCS] to give [Father] more time after release from jail." Appellant's Brief at 3. DCS maintains that the "best interests of the child are the ultimate concern in termination proceedings." Appellee's Brief at 22. DCS asserts that it is not error for a court to invoke stability or permanency and notes that "only *one (1)* of the court's extensive factual findings even mentions permanency." Id. at 23. DCS further contends that Father's alternative permanency plan of, "leaving [] Child in foster care until Father can demonstrate his stability to parent Child . . . . is unpersuasive." Id. at 23-24.

The record reveals that Child has been in Father's custody and care for a short period of time that roughly corresponds to the dismissal of Father's prior CHINS case and the initiation of the underlying CHINS proceedings in this termination. Child has been living with the same foster family since June 1, 2011 and had also lived with that same foster

16

family between May 2010 and March 2011 during a previous CHINS case involving Father. The court heard testimony from Dr. Winsch stating that Father's criminal history and current incarceration make it "difficult for [him] to see how . . . he would be capable of providing a stable home for a child." Transcript at 27. Both GAL Blanton and FCM Stotts recommended termination of Father's parental rights. GAL Blanton stated that Child "had very significant bonds with her foster parents and the other children who were at the residence" and that Father's "current incarceration makes it impossible for him to parent [Child]." Transcript at 70. FCM Stotts also stated that Child had bonded with her foster family. Id. at 179.

Based on the totality of the evidence, we conclude that the trial court's determination that termination was in Child's best interests is supported by clear and convincing evidence. See In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005) ("[T]he historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests."); In re A.B., 887 N.E.2d at 170 (explaining that the recommendations of a child's guardian ad litem and a child's case manager that parental rights should be terminated support a finding that termination is in the child's best interests).

## CONCLUSION

We conclude that the trial court's judgment terminating Father's parental rights related to Child is supported by clear and convincing evidence. We find no error and affirm.

17

Affirmed.

BARNES, J., and BRADFORD, J., concur.